NO. 26-1066

_____

# UNITED STATES COURT OF APPEALS
# FOR THE TENTH CIRCUIT

_____

Astro Companies, LLC,
*Plaintiff-Appellant*,


v.


WestFax Inc., Duck Dive Communications, LLC, d/b/a JBlast, Barry Clark, Chad
Matheson, and John Does 1-10,
*Defendant-Appellees*.

_____

On Appeal from Order Granting Defendant's Motion to Dismiss, and Order
Denying Astro Companies, LLC Motion to Reconsider
United States District Court for the District of Colorado
The Honorable Kato S. Crews, District Judge
Case No. 23-cv-02328-SKC

_____

## APPELLEES' SUPPLEMENTAL APPENDIX
### Volume 1 of 1, Pages 1-37

_____

**SPENCER FANE LLP**
Joshua C. Dickinson, KS Bar No. 20632
13815 FNB Parkway, Suite 200
Omaha, NE 68154
Telephone: (402) 965-9600
jdickinson@spencerfane.com

Johanna R. Hyman, MN Bar No. 0397151
100 South Fifth Street, Suite 2500
Minneapolis, MN 55402
Telephone: (612) 268-7009
jhyman@spencerfane.com
*Attorneys for Chad Matheson*

**Montgomery Little & Soran, P.C.**
James C. Taravella, CO No. 55179
Nathan G. Osborn, CO. No. 38951
5445 DTC Parkway, Suite 800
Greenwood Village, Colorado 80111
Telephone: (303) 773-8100
jtaravella@montgomerylittle.com

*Supplemental Appendix* filed pursuant to 10th Cir. R. 30.2; Fed. R. App. P. 28(f)

| Document Title | Date | Page |
|---|---|---|
| **Supplemental Volume 1 of 1** | | |
| *Amerifactors'* Petition for Expedited Declaratory Ruling, before the Federal Communications Commission, CG Docket No. 02-278; 05-338 | July 13, 2017 | 1 |

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**

| | |
|---|---|
| In the Matter of | ) |
| | ) |
| Rules and Regulations Implementing the | ) |
| Telephone Consumer Protection Act of 1991 | )   CG Docket No. 02-278 |
| | ) |
| Junk Fax Prevention Act of 2005 | )   CG Docket No. 05-338 |
| | ) |
| Petition for Expedited Declaratory Ruling of | ) |
| Amerifactors Financial Group, LLC | ) |

**PETITION FOR EXPEDITED DECLARATORY RULING**

Steven A. Augustino
Jennifer R. Wainwright
KELLEY DRYE & WARREN LLP
3050 K Street NW
Suite 400
Washington, D.C.  20007
(202) 342-8400 (Voice)
(202) 342-8451 (Facsimile)
saugustino@kelleydrye.com

Douglas B. Brown
RUMBERGER KIRK & CALDWELL
300 South Orange Avenue
Suite 1400
Orlando, FL  32801
(407) 839-2150
dbrown@rumberger.com

*Counsel for Amerifactors Financial Group, LLC*

July 13, 2017

4814-3580-1163v.7

**TABLE OF CONTENTS**

SUMMARY...................................................................................................................i

I.      FACTUAL BACKGROUND.................................................................................3

      A.      Statutory Provisions................................................................................3
      B.      The FCC's Interpretations of Telephone Facsimile Machine................4
      C.      Advances in Facsimile Technology.........................................................7

II.     FAXES RECEIVED ON DEVICES OTHER THAN A "TELEPHONE
      FACSIMILE MACHINE" DO NOT FIT WITHIN THE PLAIN
      MEANING OF THE TCPA ...............................................................................10

III.    MODERN ONLINE FAX SERVICES DO NOT FIT WITHIN THE
      SCOPE OF "TELEPHONE FACSIMILE MACHINE" AS DEFINED BY
      THE TCPA ........................................................................................................12

IV.     THE HARMS THAT THE TCPA SOUGHT TO AVOID ARE NON-
      EXISTENT IN THE CONTEXT OF ONLINE FAX SERVICES....................16

V.      THE *WESTFAX* ORDER DOES NOT ADDRESS ONLINE FAX
      SERVICES BUT, TO THE EXTENT IT DID, SHOULD BE
      OVERTURNED .................................................................................................19

VI.     GRANT OF THE PETITION WOULD RESTORE BALANCE TO
      PRIVATE RIGHTS OF ACTION INVOLVING FAXES...............................23

VII.    APPLYING THE TCPA TO ONLINE FAX SERVICES WOULD
      VIOLATE THE FIRST AMENDMENT .........................................................29

VIII.   CONCLUSION.................................................................................................32

4814-3580-1163v.7

## SUMMARY

Amerifactors Financial Group, LLC (Amerifactors or the Company), by and through its undersigned counsel, hereby submits to the Federal Communications Commission (FCC or Commission) this petition for declaratory ruling regarding the applicability of the Telephone Consumer Protection Act ("TCPA" or the "Act") to fax advertisements that the recipient receives through online fax services or on a device other than a telephone facsimile machine.

It has been fourteen years since the full Commission last considered advances in fax technology. During that time, cloud-based online fax services have proliferated in the industry. Today, companies of all sizes are encouraged to "replace your facsimile machine" in favor of online services to send and receive "faxes" in essentially the same way that emails are transmitted, and at least 11 million customers are doing so. Yet the FCC's pronouncements on the applicability of the TCPA's fax provisions alternate between the two poles of (a) "computerized fax modems" are within the scope of the TCPA while (z) "faxes sent as email over the Internet" are not.

These interpretations have caused substantial uncertainty as to the scope of the statute with respect to fax advertisements transmitted using modern technology, such as online fax services. Even where there has been some certainty, case results have been inconsistent with the statutory language and sound policy. The plaintiffs' bar has seized the opportunity provided by this situation, and as the Commission is aware, the number of TCPA putative class actions has skyrocketed in recent years. Amerifactors, unfortunately, is a classic example of a legitimate company that was duped into sending faxes after a fax marketer assured it of the legality of using

4814-3580-1163v.7

i

the facsimiles.  It now faces a TCPA action that could claim very substantial penalties. Amerifactors respectfully requests that the Commission take this opportunity to clarify that the TCPA does not apply to transmissions received via online fax services, thereby closing a loophole that has allowed an increasingly aggressive plaintiffs' bar to exploit the Act's remedial measures in a manner wholly inconsistent with Congress's intent.

A declaratory ruling that the TCPA does not apply to transmissions received via online fax services is necessary and appropriate for several reasons.  First, faxes that are received on a device other than a telephone facsimile machine, such as faxes received via online fax services, do not fit within the plain meaning of the TCPA.  Second, online faxes do not cause the harms that the TCPA sought to avoid.  Third, clarification on this point will restore the TCPA's balance which has been tilted by aggressive class action plaintiffs and their law firms seeking massive judgments based on the statutory penalties in the TCPA.  Specifically, the declaratory ruling sought in this petition will permit individual private rights of action when actual harm has been created but will cut off a prominent "total cash for plaintiffs" avenue that has plagued companies unlucky enough to have reached one of several frequent plaintiffs with a facsimile transmission.  Further, applying the TCPA to faxes received on a device other than a telephone facsimile machine would be an impermissible restriction on commercial speech in violation of the First Amendment of the U.S. Constitution.  The Commission should consider the obvious truth that the primary defendants targeted in TCPA fax cases are, like Amerifactors, first time users of facsimiles, believing in good faith the assurances of judgment-proof marketers that the

4814-3580-1163v.7

ii

Suppl. App. Vol. 1, p. 4 of 37

faxes are legal and an effective way to reach its customers.[1]  Such defendants are subject to

draconian potential judgments, completely out of proportion with the actual aggregate injury

suffered by the recipient.  Granting this petition will provide one small but important counter

balance to cases in which online fax services are employed.

---

[1]    One such advertiser, B2B has been referred to as "Typhoid Mary."  See Palm Beach Golf Center –Boca, Inc. v. Sarris, 311 F.R.D. 688, 691 (S.D. Fla. 2015) ("Ms. Abraham [owner of B2B] has been described as the modern day Typhoid Mary of the small business community due to the number of lawsuits generated by her services.")

4814-3580-1163v.7

iii

**Before the**
**FEDERAL COMMUNICATIONS COMMISSION**
**Washington, D.C.  20554**

| | | |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| Rules and Regulations Implementing the | ) | |
| Telephone Consumer Protection Act of 1991 | ) | CG Docket No. 02-278 |
| | ) | |
| Junk Fax Prevention Act of 2005 | ) | CG Docket No. 05-338 |
| | ) | |
| Petition for Expedited Declaratory Ruling of | ) | |
| Amerifactors Financial Group, LLC | ) | |

## PETITION FOR EXPEDITED DECLARATORY RULING

Cloud technology has transformed many services throughout the United States. Companies today have available a multitude of SaaS, IaaS, PaaS and many other "as a Service" options to replace traditional on-premises equipment.  The same is true for the sending and receipt of facsimiles.  Technological advances have greatly displaced traditional facsimile machines and dial-up modem technologies of the past.  With their displacement has come the disappearance of the harms that underlie the fax advertising restrictions of the Telephone Consumer Protection Act of 1991.  Online facsimile services, which allow customers to send and receive documents in digital format entirely over the Internet or via Internet interfaces, have brought individuals and companies an alternative to traditional fax machines.  These services function differently than traditional fax services.  Users access "faxes" the same way that they do email:  by logging into a server over the Internet or by receiving a pdf attachment to an email.

Unfortunately, the Federal Communications Commission (FCC or Commission) has not addressed facsimile technology in nearly 15 years, and its previous pronouncements on the scope of the TCPA as it applies to alternative technologies is muddled at best.  "Faxes sent as email over the Internet re not subject to the TCPA, but "computerized fax modems" may be

4814-3580-1163v.7

within its scope. Seizing on these contradictions, frequent class action plaintiffs (and law firms that specialize in TCPA cases) continue to exploit the private right of action to pursue massive awards wholly out of proportion to any actual harm caused by a facsimile transmission. However, the Commission has an opportunity to reverse the trend of "decisions that expanded the scope of the TCPA, and [] litigation across the country that, in many cases, has further increased liability for good actors."[2] In order to stop abusive class action litigation under the TCPA, Amerifactors,[3] by and through its undersigned counsel, hereby requests the Commission re-examine the state of facsimile technology today and issue a declaratory ruling that the TCPA does not apply to faxes received via an online facsimile service.[4]

---

[2] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 et al.*, CG Docket No. 02-278 et al., Declaratory Ruling and Order, FCC 17-52, Dissenting Statement of Commissioner Michael O'Rielly (rel. July 10, 2015).

[3] Amerifactors, a wholly-owned subsidiary of Gulf Coast Bank, provides financing to businesses of all sizes throughout the U.S. In June 2016, Amerifactors engaged third party vendors on a one-time basis to send online fax transmissions on behalf of Amerifactors. Amerifactors is currently a defendant in a putative class action lawsuit for alleged violation of the TCPA filed by one of the recipients of the transmissions, and could suffer significant monetary damages as a result. Amerifactors disputes the allegation in the Complaint that its facsimile is an advertisement within the scope of 47 U.S.C. § 227(b)(B)(c)(1).

[4] 47 C.F.R. § 1.2. For purposes of this petition, an online facsimile service is a cloud-based service consisting of a fax server or similar device that is used to send or receive documents, images and/or electronic files in digital format over telecommunications facilities. An online fax service stores received "faxes" on a computer accessible via the Internet, and allows the recipient to view, forward, delete or print the file as desired. Online faxes may be held on a server for viewing by the user or sent to the user via email as an attachment, as desired by the customer.

4814-3580-1163v.7

2

Suppl. App. Vol. 1, p. 7 of 37

## I.    FACTUAL BACKGROUND

### A.    Statutory Provisions

The Telephone Consumer Protection Act of 1991 provides (among other things) that "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States … to use any telephone facsimile machine, computer, or other device to send, to a telephone facsimile machine, an unsolicited advertisement" unless certain conditions apply.[5]

A "telephone facsimile machine" is defined in the statute as "equipment which has the capacity (A) to transcribe text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper."[6]

The FCC has long recognized that "the statute is ambiguous with respect to [the definition of a telephone facsimile machine] and the legislative history provides no guidance [on the subject]."[7]

Indeed, there is no legislative history on the definition of "telephone facsimile machine," nor on the subsidiary term within that definition, a "regular telephone line" over which such facsimile transmissions must be received.  Yet, the plaintiff must prove each of these elements in order to state a claim under the statute.  To the extent there is illuminating legislative

---

[5]    47 U.S.C. § 227(b)(1)(C).

[6]    47 U.S.C. § 227(a)(3).

[7]    *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Memorandum Opinion and Order, 10 FCC Rcd 12391, 12405 (¶ 30) (1995) (*1995 TCPA Reconsideration Order*).

4814-3580-1163v.7

3

history, it relates to the general harms that Congress wished to address.  The 1991 House Report on the Act makes clear that the facsimile provisions of the TCPA were intended to curb two specific types of harms: "First, [a fax advertisement] shifts some of the costs of advertising from the sender to the recipient.  Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax."[8]  The statute provides a private right of action for individuals harmed in these ways.  It is telling, however, that there is no mention of "class action" or Rule 23 in any of the legislative history of the Act.[9]

### B.    The FCC's Interpretations of Telephone Facsimile Machine

Although the Commission has periodically addressed inquiries relating to fax technology, substantial uncertainty as to the scope of the statute remains.

The Commission first addressed fax machines in the *1992 TCPA Report and Order* in a single paragraph.[10]  The Commission's discussion in that paragraph, however, involved the identifying information that outbound fax machines must provide, and the absence of liability of common carriers for merely transmitting faxes.[11]  There was no discussion in the

---

[8]    H.R. Rep. No. 317, 102d Cong., 1st Sess. 11 (1991).

[9]    *See, e.g.,* H.R. Rep No. 102-317, 102d Cong., 1st Sess. 11 (1991); S. Re. No. 102-178, 102d Cong., 1st Sess. 11 (1991).  Searches for the terms "class action," "Federal/s court/s court /p 'class action'," in these and other documents pertinent to the legislative history of the TCPA returned zero results.

[10]    *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 7 FCC Rcd 8752, 8779-80 (¶ 54) (1992) (*1992 TCPA Report and Order*).

[11]    *Id.*

4814-3580-1163v.7

4

*1992 TCPA Report and Order* of the types of equipment that would constitute a "telephone facsimile machine."

The Commission returned to facsimile machines three years later, in response to a request from equipment manufacturers regarding the scope of the identification requirement for fax equipment.[12]  In that order, the FCC held that "fax modem boards" were within the scope of the TCPA's prohibition on unsolicited faxes and the identifying information requirement.[13]  The Commission's discussion again was brief – a mere two paragraphs – and did not precisely define a "fax modem board."  In 1991, fax modem cards were common and the primary internet connection was the "AOL" telephone signal.  Under those circumstances interruption was a serious issue over a "regular telephone line."

The full Commission's third – and most recent – discussion of telephone facsimile machines came in 2003.  In that order, the FCC concluded that "computerized fax servers" and personal computers "equipped with, or attached to, modems" are subject to the TCPA's prohibition on unsolicited faxes.[14]  The Commission did not define a "computerized fax server,"

---

[12]   Section 227(d) of the TCPA requires telephone facsimile machines manufactured after December 20, 1991 to include "the date and time sent, an identification of the business, other entity or individual sending the message and the telephone number of the sending machine or of such business, other entity or individual."  47 U.S.C. § 227(d)(2).

[13]   *1995 TCPA Reconsideration Order* (¶ 28).

[14]   *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Report and Order, 18 FCC Rcd 14014, 14133 (¶ 200) (2003) (*2003 TCPA Report and Order*).

4814-3580-1163v.7

5

except to describe it as equipment which "enable[s] multiple desktops to send and receive faxes from the same or shared telephony lines."[15]

The Commission clarified, however, that "[the TCPA's prohibition on unsolicited faxes] does not extend to facsimile messages sent as email over the Internet."[16]  No further explanation of "facsimile messages sent as email over the Internet" was provided.

In the nearly 15 years since the *2003 TCPA Report and Order*, the full Commission has not revisited advances in fax technologies and services.  In 2015, however, the Consumer and Governmental Affairs Bureau (Bureau) responded to a six-year old petition – on which only seven parties commented – by repeating the statements from the *2003 TCPA Report and Order* in the context of an "efax" which it defined as "a document sent as a conventional fax then converted to and delivered to a consumer as an electronic mail attachment."[17]  This decision, which was released on delegated authority and was not subjected to a Commission vote, raised more questions than it answered, however.  By so loosely defining an "efax," the Bureau created confusion regarding the Commission's previous statements, particularly the statement addressing faxes sent over the Internet.  As a result, there remains substantial

---

[15]  *Id.*  This description appears to have been referencing equipment located on a customer's premises and that connects computers on a single LAN.  *See Newton's Telecom Dictionary*, 16th Edition (2000) ("Fax server:  A fax server sits on a local area network and literally serves faxes to those people using it.  Those people may be on the LAN physically, i.e., joined by wires to the server.  Or they may be outside, reaching the LAN over phone lines.").

[16]  *Id.*

[17]  *Westfax, Inc. Petition for Consideration and Clarification*, Declaratory Ruling, 30 FCC Rcd 8620 (¶ 1) (CG Bur. 2015).

4814-3580-1163v.7

6

uncertainty regarding what types of services are within the scope of the TCPA and what services are not.

### C.    Advances in Facsimile Technology

Since the TCPA was enacted in 1991, fax technology has improved by leaps and bounds, such that many "fax" transmissions now do not even require a telephone facsimile machine either to send or receive documents. Rather, they are accessed via online servers and/or sent via email services or scanning equipment, such as digital scanners or digital copy machines, to the recipient.

With the rise in cloud computing, dozens of service providers have begun to offer faxing services accessible over the Internet. Although aggregate industry statistics are not available, one such provider claims that it alone serves 11 million customers with a cloud based fax service.[18]

Online fax services offer users the ability to both send and receive "faxes" using cloud-based servers. Users access the fax services via the Internet or a dedicated IP connection. For outbound faxes, the user can send a document from many common software programs, including email, word processing programs, presentation programs, and scanning equipment such as digital scanners or digital copy machines. For inbound faxes, the user can acquire a new number or port its existing fax number for such purpose. Inbound faxes are held in digital form at the cloud-based server, where the user accesses the document via the online portal or via an email attachment sent to the user's email account. Either way, the user does not automatically print the fax, and need not ever print a fax.

---

[18]    *See* Exhibit 3.

4814-3580-1163v.7

As explained in a recent review:

> At the heart of most fax services is a web interface through which you can send documents and text from your computer to a fax machine. Received faxes are also accessible through the web interface, usually as PDF attachments. Sometimes they are viewable directly from your browser, though some services insist that you download faxes before you can read them.[19]

Moreover, many services allow users to block certain numbers or senders from sending faxes, providing an effective protection against unwanted unsolicited advertisements.[20] This feature enables a user to avid seeing a fax at all, just as smart phones allow users to block callers and spam filters block junk emails. Online fax services are highly configurable, in stark contrast to a traditional fax machine.

Online fax services are offered by dozens of companies, ranging from public companies such as Ring Central, Inc. and j2 Global Inc., to smaller providers that only advertise over the Internet. These companies provide online fax services to millions of customers.[21] Publications like *PC Mag* and others regularly compare and review online fax service providers.

---

[19]  *See* PCMag.com Article (May 3, 2017) available at http://www.pcmag.com/article2/0,2817,2385681,00.asp (PCMag.Com Article) (attached as Exhibit 1).

[20]  *See* "The Best Online Fax Services," Top Ten Reviews, http://www.toptenreviews.com/business/services/best-online-fax-services/ (noting services that permit users to block senders) (Best Online Fax Services) (attached as Exhibit 2).

[21]  eFax®, an online fax service provided by j2 GLOBAL, Inc. purportedly provides services to more than 11 million customers. *See* Exhibit 3.

Suppl. App. Vol. 1, p. 13 of 37

One reviewer reported that online fax services generally cost around $10 per month, with some free service options, and other add-on services available.[22]

Critically, virtually all of the online fax providers emphasize that their services do away with the traditional fax machine. For example, fax broadcaster RingCentral explained in its most recent Annual Report to the Securities and Exchange Commission that the "RingCentral Fax solution provides Internet fax capabilities that allow businesses to send and receive fax documents without the need for a fax machine."[23] Similarly, j2 Global, Inc. reports that its eFax services "enable users to receive faxes into their email inboxes."[24] And MetroFax service was described as "making it easy to skip the fax machine and instead send and receive documents online."[25]

PC Mag explained in its review:

> Buying a fax machine and paying for a dedicated landline just to send the occasional fax is a tough sell these days. Online fax services can do it all, and do it better, for a single monthly fee.[26]

This petition presents an opportunity for the Commission to address these new online fax services, and to clarify its 2003 statement that "faxes sent as email over the Internet"

---

[22]    "Best Online Fax Services," supra.

[23]    RingCentral, Inc., SEC Form 10-K (Feb. 2017). RingCentral also explained in its pending petition for declaratory ruling that its fax transmissions can be routed "to the recipient's telephone number or other address for delivery." *See RingCentral, Inc. Petition for Declaratory Ruling*, CG Docket No. 02-278, 3 (filed July 6, 2016) (RingCentral Petition).

[24]    j2 GLOBAL, INC., SEC Form 10-K (Mar. 2017).

[25]    "Best Online Fax Services" *supra.*

[26]    PCMag.Com Article, *supra.*

4814-3580-1163v.7

9

are not subject to the TCPA. It also provides the Commission with the opportunity to consider the economic consequences of an overly broad inclusion of new technologies that create perverse uncertainty, discourage innovation, and deter adoption of the best technological choices because of virtually unlimited financial exposure. At least one other party, Joseph T. Ryerson & Son, Inc., has requested a similar clarification from the Commission.[27]

## II.     FAXES RECEIVED ON DEVICES OTHER THAN A "TELEPHONE FACSIMILE MACHINE" DO NOT FIT WITHIN THE PLAIN MEANING OF THE TCPA

The plain language of the statute makes clear that Congress did not intend the TCPA to cover faxes received on devices other than a telephone facsimile machine. The facsimile provision of the TCPA provides that, with certain exceptions, "[i]t shall be unlawful for any person within the United States, or any person outside the United States if the recipient is within the United States … to use any telephone facsimile machine, computer, or other device to send, *to a telephone facsimile machine*, an unsolicited advertisement."[28] The statute further defines "telephone facsimile machine" as "equipment which has the capacity (A) to transcribe

---

[27]     *See Joseph T. Ryerson & Son, Inc.'s Petition for Declaratory Ruling*, CG Docket Nos. 02-278, 05-338 (filed Nov. 4, 2015) (Ryerson Petition). The Ryerson Petition differs from this petition in two key respects: (1) it asks the Commission to declare that transmissions "that *initiate* in digital form *and* are received in digital form do not fall within the TCPA"; and (2) it asserts that these types of transmissions should be governed by the Controlling the Assault of Non-Solicited Pornography And Marketing (CAN-SPAM) Act of 2003. By contrast, the relief sought in the instant petition depends solely on the method of receipt of a transmission – namely, the TCPA does not apply to fax advertisements that the recipient *receives* through online fax services or on a device other than a telephone facsimile machine. At this time, Amerifactors takes no position as to whether the transmissions described in this petition should be governed by the CAN-SPAM Act.

[28]     47 U.S.C. § 227(b)(1)(C) (emphasis added).

4814-3580-1163v.7

text or images, or both, from paper into an electronic signal and to transmit that signal over a regular telephone line, or (B) to transcribe text or images (or both) from an electronic signal received over a regular telephone line onto paper."[29]

Critical to understanding the definition above is the distinction between the statutory prohibition's applicability to the *sending* of faxes and to the *receipt* of faxes. With respect to the sending of faxes, the statute prohibits unsolicited faxes that originate on one of three types of equipment: a "telephone facsimile machine," a "computer," or an "other device." With respect to the receipt of faxes, by contrast, the statute prohibits the sending of faxes only to a "telephone facsimile machine." The statute does not reference receipt of a fax by a computer or "other device."

This difference in language is critical. Plainly under the TCPA, a fax could be unlawful only if it is sent to a "telephone facsimile machine." Faxes sent to other types of equipment – including computers – are not prohibited. If Congress had intended for the TCPA to apply to fax transmissions received on computers or any other device except a telephone facsimile machine, it would not have limited the list of receiving devices to only a "telephone facsimile machine." Indeed, "because statutory language represents the clearest indication of Congressional intent,"[30] "where Congress includes particular language in one section of the statute but omits it in another section of the same Act, it is generally presumed that Congress acts

---

[29]    47 U.S.C. § 227(a)(3).

[30]    *Nat'l Pub. Radio, Inc. v. FCC*, 254 F.3d 226, 230 (D.C. Cir. 2001) (internal citations omitted).

4814-3580-1163v.7

11

intentionally and purposely in the disparate inclusion or exclusion."[31] This basic axiom of statutory construction compels the conclusion that if the fax is received by a device other than a telephone facsimile machine, as defined by the TCPA, the Act does not cover that transmission.

As explained in the next section, customers receiving faxes via online fax services do not receive such documents on a telephone facsimile machine.

## III. MODERN ONLINE FAX SERVICES DO NOT FIT WITHIN THE SCOPE OF "TELEPHONE FACSIMILE MACHINE" AS DEFINED BY THE TCPA

The House Report on the TCPA explained that in 1991, fax machines were "designed to accept, process, and print all messages which arrive over their dedicated lines."[32] At the time the statute was adopted, fax machines were integrated devices attached to a single plain old telephone service (POTS) line *i.e.* regular telephone lines. The machine answered the phone (or could be activated upon hearing the fax tone), exchanged communications via an internal modem (typically transmitting at 9600 baud (bps) or 14400 baud (bps), much slower than today's megabit or gigabit per second speeds) and printed the fax on special paper.[33]

---

[31]     *Clark v. Absolute Collection Service, Inc.*, 741 F.3d 487, 490-491 (4th Cir. 2014); *see also Independent Insurance Agents of America, Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) (doctrine of "expression unius est exclusion," precluded application of otherwise reasonable agency interpretation of statute). *See also Bais Yaakov of Spring Valley v. FCC,* No. 14-1234 (D.C. Cir. 2017) (commenting that with respect to the opt-out notice requirement for fax advertisements "Congress drew a line in the text of the statute between unsolicited fax advertisements and solicited fax advertisements. Unsolicited fax advertisements must include an opt-out notice. But the Act does not require (or give the FCC authority to require) opt-out notices on solicited fax advertisements. It is the Judiciary's job to respect the line drawn by Congress, not to redraw it as we might think best.").

[32]     H.R. Rep. No. 317, 102d Cong., 1st Sess. 11 (1991).

[33]     9600 baud is equal to .0000096 Gigabits per second.

4814-3580-1163v.7

By contrast, modern faxing technologies, such as online fax services, do not even require a physical telephone facsimile machine to receive a transmission, let alone automatically trigger printed transmissions. As noted above, online fax services permit information to be sent or received via a facsimile server[34] that converts documents, images and/or electronic files to or from transmissions over telecommunications facilities using either traditional TDM technology or fax over IP technologies. An online fax service stores documents on a computer and allows the recipient to view, forward, delete or print the file via a web interface. Online faxes may be held on a server for viewing by the user or sent to the user via email as an attachment.

Not surprisingly, the fact that users of online fax services do not need to purchase or maintain a physical fax machine is often a key selling point. Providers regularly market that services are available "without the need for a fax machine," allow users to "skip the fax machine" or "replace the fax machine."[35]

The equipment used in online fax services are not "telephone facsimile machines" under the TCPA. The equipment used are computers (specifically, servers) or "other devices" that are capable of transmitting digital information. But, since the TCPA prohibition only applies to faxes received on a telephone facsimile machine, not to documents received on computers and other devices, the statute does not apply to such services.

---

[34] *See* PCMag.Com http://www.pcmag.com/article2/0,2817,2385681,00.asp (noting that "there are many services that let you send and receive faxes from your computer—no modem screech or paper printouts required," and explaining that such services "either assign you a new fax number or let you port over your existing fax number").

[35] *See, supra,* pp. 7-9.

4814-3580-1163v.7

13

Suppl. App. Vol. 1, p. 18 of 37

Moreover, the Commission cannot shoehorn online fax services into the TCPA through a creative interpretation of the statute's definition of "telephone facsimile machine."[36] First, the term "capacity" in the definition of telephone facsimile machine refers to present and "in use" capability. It does not square with the statute to assert that every computer is a facsimile machine because it has the "potential" to be (and generally is) connected to a printer.[37] Such an interpretation would make the statutory language nonsensical. More importantly, interpreting a device to be a telephone facsimile machine based on the device's potential "capacity" improperly expands the scope of the TCPA.[38] The Commission previously has acknowledged "[t]he Congressional Findings in the TCPA's preamble stress that '[i]ndividual's privacy rights, public safety interests, and commercial freedoms of speech and trade must be balanced in a way that protects the privacy of individuals and permits legitimate telemarketing practices.' … [and that] The President, when signing the TCPA, noted that he signed the bill because it gives the

---

[36]   As Commissioner O'Rielly recently noted, even if there is ambiguity about the applicability of the TCPA to online fax services (although Amerifactors submits that the plain language is clear that it does not), the Commission should go "back to Congress for clear guidance on the issue rather than shoehorn a broken regime on a completely different technology." *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 et al.*, CG Docket No. 02-278 et al., Declaratory Ruling and Order, FCC 17-52, Dissenting Statement of Commissioner Michael O'Rielly (rel. July 10, 2015).

[37]   *2003 TCPA Report and Order*, (¶ 201).

[38]   An analogous question concerning the interpretation of "capacity" in the TCA is pending in *ACA International v. FCC* (DC Cir. No. 15-1211 et al., (argued October 19, 2016). As of the date of this petition was submitted, the court had not announced its decision in the case.

4814-3580-1163v.7

14

Commission 'ample authority to preserve legitimate business practices.'"[39] To determine that a device such as a computer is a telephone facsimile machine simply because it has the "capacity" to be attached to a printer – rather than assessing a device's present capacity to "transcribe text or images, or both" – could "subject[] not just businesses and telemarketers but almost all our citizens to liability for everyday communications."[40]

Further, even if online fax equipment had the requisite "capacity," such servers do not transmit or receive faxes over a "regular telephone line." As far as counsel can determine, the issue of what constitutes a "regular telephone line" under the TCPA is an issue of first impression for the Commission. The qualification most likely refers to the single voice telephone line to which original fax machines were attached. This would square with the statute's concern that unsolicited faxes "tied up" a user's telephone line, preventing the customer from using the line while a fax was being received.

If a "regular telephone line" refers to a POTS line, online fax services clearly would not be within the scope of the TCPA. Online fax services are cloud-based services. They are not accessed by customers, or by senders of documents, via POTS lines. Instead, such servers sit within the IP cloud, and are accessed by other service providers using IP networking

---

[39] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Junk Fax Prevention Act of 2005, Application for Review filed by Anda, Inc., Petitions for Declaratory Ruling, Waiver, and/or Rulemaking Regarding the Commission's Opt-Out Requirement for Faxes Sent with the Recipient's Prior Express Permission*, CG Docket Nos. 02-278, 05-338, Order, FCC 14-164 (¶ 27) and fn. 96 (rel. Oct. 31, 2014).

[40] *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 et al.*, CG Docket No. 02-278 et al., Declaratory Ruling and Order, FCC 17-52, Dissenting Statement of Commissioner Ajit Pai (rel. July 10, 2015).

4814-3580-1163v.7

15

Suppl. App. Vol. 1, p. 20 of 37

(or, in some cases, the Internet). These facilities are complex telecommunications facilities, not "regular telephone lines" and they do not get "tied up."

In sum, an online fax service receives transmissions on a device other than a telephone facsimile machine, and via facilities that are not regular telephone lines. Online fax services would not automatically print the transmission, but rather would make the document available for accessing at the recipient's convenience, or pushed to the customer, much like email is accessible via a web interface or pushed to an email client. This equipment is not within the scope of the TCPA and any faxes received by such equipment are not subject to the TCPA's prohibitions.

## IV.    THE HARMS THAT THE TCPA SOUGHT TO AVOID ARE NON-EXISTENT IN THE CONTEXT OF ONLINE FAX SERVICES

The conclusion above comports with the TCPA's policy objectives as well. The House Report on the TCPA makes clear that the facsimile provisions of the TCPA were intended to curb two specific types of harms: "First, [a fax advertisement] shifts some of the costs of advertising from the sender to the recipient. Second, it occupies the recipient's facsimile machine so that it is unavailable for legitimate business messages while processing and printing the junk fax."[41] On the issue of shifting advertising costs to the recipient, the Report explained "[i]n the case of fax advertisements … the recipient assumes both the cost associated with the use of the facsimile machine and, the cost of the expensive paper used to print out facsimile messages. It is important to note that these costs are borne by the recipient of the fax

---

[41]    H.R. Rep. No. 317, 102d Cong., 1st Sess. 11 (1991).

4814-3580-1163v.7

16

advertisement regardless of their interest in the product or service being advertised."[42]  On the issue of occupation of the recipient's fax machine, the Report explained "when a facsimile machine is receiving a fax, it may require several minutes or more to process and print the advertisement.  During that time, the fax machine is unable to process actual business communications.  Only the most sophisticated and expensive facsimile machines can process and print more than one message at a time."[43]

However, neither of these harms exist in the case of faxes received by online fax services.  First, online faxes do not shift the cost of advertising to the recipient as contemplated by the House Report.  As opposed to a traditional fax machine that indiscriminately prints all faxes it receives, an online fax sits on a server or is delivered to an e-mail inbox.  No costs are imposed on the recipient.[44]  No documents are printed, except and only if the recipient chooses to print it.  It cannot be said that the recipient suffers the monetary harm if he or she *chooses* to print the electronic transmission.  At most, the consequences of receiving a fax through an online fax service are the same as receiving direct mail advertisements or e-mail spam, neither of which are covered by the TCPA.  Any interruption or annoyance factor associated with online fax services is no greater than a walk to the trash can to toss direct mail or the push of a button to delete an email.[45]

---

[42]     *Id.*

[43]     *Id.*

[44]     Most online fax services offer a set number of received faxes per month, such as 250 or 1000, for no separate charge.

[45]     *See Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) (holding that the "journey from mail box to trash can" is insufficient to allow the government to "shut off the flow of mailings to protect those recipients who might potentially be offended.")

4814-3580-1163v.7

17

Second, faxes received via online fax services do not occupy the recipient's machine so that it is unavailable for other messages. Online fax services are scaled to handle dozens if not hundreds of simultaneous transmissions. A user can be sending a fax while a fax is being received by the online fax service. And, since the user's voice communications generally are handled by a separate provider (or at least by separate equipment), the user is not prevented from carrying on voice communications while a "fax" is being received. Moreover, online fax services do not even require the sender or recipient to have a physical telephone facsimile machine attached to a dedicated phone line – rather "[a] variety of sites can send you a fax by assigning you a virtual fax phone number. The faxed document reaches you via email, typically as a TIF image or other graphics file."[46] Thus, there is no occupation of the user's facilities and no harm to the user by receipt of an online fax.

Because the two specific harms from fax advertisements identified by Congress – namely, the shift in advertising costs and occupation of the fax machine – do not exist for faxes received via online fax services, the Commission, consistent with the "concrete injury in fact" requirement articulated by the Supreme Court in *Spokeo, Inc. v. Robins*, -- U.S. --, 136 S.Ct. 1540, 1547-48 (2016), should declare that the TCPA does not apply to such transmissions.

Even if the Commission believes that sometimes there may be an injury when new technologies are used, it should adopt presumptions or "rules" that require the plaintiff to

---

(internal citations omitted). *See also* H.R. Rep. No. 317, 102d Cong., 1st Sess. 11 (1991) ("The Committee found that when an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter.").

[46] Lance Whitney, "How to Send or Receive a Fax Online," PCMag.com (May 11, 2016) *available at* http://www.pcmag.com/article/344344/how-to-send-or-receive-a-fax-online.

4814-3580-1163v.7

18

show such an actual injury for each transaction. Shifting the burden of proof to the defendant when the plaintiff has exclusive possession of the relevant facts of injury would be manifestly unfair.

## V.    THE *WESTFAX* ORDER DOES NOT ADDRESS ONLINE FAX SERVICES BUT, TO THE EXTENT IT DID, SHOULD BE OVERTURNED

In August 2015, the Consumer and Governmental Affairs Bureau (Bureau) issued a declaratory ruling concluding that an "e-fax" "is covered by the consumer protections in the [TCPA] and Junk Fax Prevention Act."[47] However, the *Westfax Order* was based on a bare-bones petition that was filed more than five years before the decision was issued. The record leading up to the decision was minimal – just seven parties commented on the question presented. Thus, the Bureau did not have the opportunity to fully consider online fax technology when the *Westfax Order* was released. Further, there was no serious effort to address the paramount technical changes in the industry. The diminished significance of "faxing" has lost its relative importance to e-commerce and the consequences of applying a no-fault liability statute by class proceedings creates the specter of ruin to even large business enterprises. The position of defendants fighting these cases is disadvantaged by the inability of district courts to decide the enforceability of even the most informal FCC staff policy statement, despite the seemingly clear

---

[47]    *Westfax, Inc. Petition for Consideration and Clarification, Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, Junk Fax Protection Act of 2005*, CG Docket Nos. 02-278, 05-338, Declaratory Ruling, DA 15-977 (rel. Aug. 28, 2015) (Westfax Order).

4814-3580-1163v.7

19

language of the Hobbs Act, 28 U.S.C. § 2342 vesting authority of the courts of appeals to review FCC Rules and policy statements the FCC has provided.[48]

As a result of this limited record, the *Westfax Order* does not address online fax services. The Bureau's discussion of "e-faxes" oversimplified the term and conflated several possible services into one. It defined the term as "a document sent as a conventional fax then converted to and delivered to a consumer as an electronic mail attachment."[49] This description implies that an ordinary fax transmission occurred, and that the user alters the transmission only after receipt of the fax. This may be true of some fax transmissions (though Amerifactors is not sure exactly what services may be covered), but it is not true of online fax services. Online fax services do not receive documents as "conventional faxes" and no telephone facsimile machine is involved. Instead, online fax services receive transmissions – from whatever type of device – as digital files over computer servers that process and manage multiple documents simultaneously. While the user may choose to print files if he or she wishes, this choice does not render the document a "conventional fax."

More importantly, both the *Westfax* Order and the *2003 TCPA Report and Order* (which the *Westfax Order* purports to apply) offer three unpersuasive justifications for extending

---

[48]    For example, in CE Design, Ltd v. Prisim Bus Media, Inc., 606 F.3d 443, 450 (7th Cir. 2010) and Nache v. Walburg, 715 F.3d 680 (8th Cir. 2013), the Seventh and Eighth circuits refused to consider the validity of FCC policies and required the defendants to file a Petition with the FCC.

[49]    *Westfax Order*, ¶ 1. The Bureau also relied on Westfax's explanation that "a document sent as a fax over a telephone line to the recipient's fax number becomes an efax when a fax server on the receiving end converts the fax transmission into a digital image file or PDF that is in turn sent to the recipient as an attachment to an email message." *Id.*, ¶ 4. However, online faxes do not necessarily need a "telephone line" to initiate the transmission – rather, online faxes can be transmitted using either traditional TDM technology or fax over IP technologies.

4814-3580-1163v.7

20

the TCPA to "online faxes": (1) faxes "sent to a computer or fax server may shift the advertising costs of paper and toner to the recipient, if they are printed"; (2) e-faxes can cause "interference, interruptions, and expense"; and (3) e-faxes "may increase labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business."[50]  On the issue of shifting advertising costs, the key phrase in *Westfax Order* and the *2003 TCPA Report and Order* is "if they are printed."[51]  As explained above, when Congress enacted the TCPA, it sought to address the harms associated with fax transmissions that *automatically* triggered printed transmissions on a physical fax machine. With online fax services and possibly e-faxes (whatever their scope), however, the service is fully configurable, allowing the user to determine what action is taken depending on the sender and/or the technology involved, and depending on the user's delivery preferences.  It cannot be said that the recipient suffers the monetary harm discussed in the House Report if he or she *chooses* to print the electronic transmission.  If the user chooses to delete a file rather than print it, no expense is incurred and no harm flows to the user.

On the second issue of interference, interruptions, and expense, online fax services do not occupy the recipient's facsimile machine so that it is unavailable for other messages.  Indeed, the recipient does not even need a fax machine to receive an online fax transmission.[52]

---

[50]     *Westfax Order*, ¶¶ 10-11; *see also 2003 TCPA Report and Order*, ¶ 202.

[51]     *Westfax Order*, ¶ 11; *2003 TCPA Report and Order*, ¶ 202.

[52]     *See* PCMag.Com Article, *supra* (noting that "there are many services that let you send and receive faxes from your computer—no modem screech or paper printouts required,"

4814-3580-1163v.7

The third justification for applying the TCPA to "efaxes" is that such transmissions "may increase labor costs for businesses, whose employees must monitor faxes to determine which ones are junk faxes and which are related to their company's business."[53] However, this concern is not a cognizable injury under the TCPA. It is not one of the two specific types of harm that the TCPA was intended to avoid. Rather, this appears to be the same caliber of "harm" that Congress deemed inconsequential for direct mail advertisements.[54] Thus, the *Westfax Order* appears to be aimed at a different service and different harms than the online fax services that are the subject of this petition. Further, with an online fax service whether the receipt of a document actually causes harm is clearly dependent on a myriad of circumstances such as whether the spam filter collects the messages and on whether the "email" was ever opened. Such fax services are functionally identical to an email, not a traditional facsimile. Therefore, the "efaxes" addressed in *Westfax* are different than the online fax services addressed in this petition.

But even if an "e-fax" could encompass some types of online fax services, the Commission should not follow the *Westfax Order*. As a Bureau decision, the *Westfax Order* is not binding upon the full Commission. Indeed, were the *Westfax Order* to conflict with prior

---

and explaining that such services "either assign you a new fax number or let you port over your existing fax number").

[53]    *Westfax Order*, ¶ 11; *2003 TCPA Report and Order*, ¶ 202.

[54]    *See* H.R. Rep. No. 317, 102d Cong., 1st Sess. 11 (1991) ("The Committee found that when an advertiser sends marketing material to a potential customer through regular mail, the recipient pays nothing to receive the letter."). *See also Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983) (holding that the "journey from mail box to trash can" is insufficient to allow the government to "shut off the flow of mailings to protect those recipients who might potentially be offended.") (internal citations omitted).

4814-3580-1163v.7

FCC precedent, the Bureau's action would exceed the authority delegated to the Bureau by the Commission.[55]  Further, for the reasons explained previously, a fax received via an online fax service does not fall within the statutory prohibition on unsolicited faxes sent to a "telephone facsimile machine."  To the extent the *Westfax Order* would treat a fax received via on online server as within the statutory definition, the conflict with the statute would be enough to overturn the Bureau's decision.[56]  Therefore, to the extent that the Commission determines the *Westfax Order* applied to online fax services, the decision should be overturned.

## VI.    GRANT OF THE PETITION WOULD RESTORE BALANCE TO PRIVATE RIGHTS OF ACTION INVOLVING FAXES

To be clear, this petition does not ask the Commission to absolve fax senders from all liability under the TCPA.  Rather, it seeks a narrow declaratory ruling that the TCPA does not apply to fax transmissions that the recipient receives on a device other than a telephone facsimile machine.  Faxes that are received by traditional telephone facsimile machines would still be subject to the TCPA.  Any recipient suffering injury as a result of an unsolicited fax sent to a telephone facsimile machine would retain the ability to seek compensation for that harm under the TCPA's private right of action.  Thus, the petition does not seek to deprive consumers of a remedy for illegitimate fax advertisement transmissions.  Rather, it seeks to rein in the number of putative TCPA class actions arising from fax advertisements, which appear to benefit

---

[55]    *See* 47 C.F.R. § 0.361 (authority delegated to the Chief, Consumer and Governmental Affairs Bureau).

[56]    *See* 47 C.F.R. § 1.115 (applications for review of actions taken on delegated authority).

4814-3580-1163v.7

23

only plaintiffs' attorneys.[57]   There is no economic support or even attempted analysis to suggest

that the only mechanism to induce suits is a massive class action that includes all persons who

were sent faxes or all persons who received the "advertisement" regardless of how it was

received, and had no actual injury.

Senator Hollings, a primary sponsor of the TCPA provided his expectation on

how the TCPA's $500.00 minimum recovery would work:

> Small claims court or a similar court would allow the consumer to
> appear before the court without an attorney.  The amount of
> damages in this legislation is set to be fair to both the consumer
> and the telemarketer.  However, it would defeat the purposes of the
> bill if the attorney's costs to consumers of bringing an action were
> greater than the potential damages.  I thus expect that the States
> will act reasonably in permitting their citizens to go to court to
> enforce this bill.[58]

In *Mims v. Arrow Financial Services, LLC*, 565 U.S. 318, 384 (2012) the

Supreme Court held that the TCPA did not preclude federal jurisdiction, thus abrogating contrary

---

[57]   Indeed, attorneys' fees often account for a significant portion of the "damages" awarded to TCPA class action plaintiffs.  *See, e.g., Kolinek v Walgreen Co.*, 311 F.R.D. 483, 502-03 (N.D. Ill. 2015) (36% fee award; $2.8 million); Lees v. Anthem Ins. Cos., No. 4:13cv1411, 2015 WL 3645208, at *4 (E.D. Mo. June 10, 2015) (34% fee award; $1.6 million); Craftwood Lumber Co. v. Interline Brands, Inc., No. 11–cv–4462, 2015 WL 1399367, at *5 (N.D. Ill. Mar. 23, 2015) (23.75% fee award; or $9.5 million); Rose v. Bank of America Corp., No. 5:11-CV-02390-EJD, 2014 WL 4273358, at *13 (N.D. Cal. 2014) (8% fee award after applying lodestar with 2.5 multiplier;  or $2.4 million); Arthur v. Sallie Mae, Inc., No. 10–cv–198, 2012 WL 4076119, at *1 (W.D. Wash. Sept. 17, 2012) (20% fee award; $4.8 million).  There are a number of reasons courts reduce the fee award, including that TCPA cases are "prone to settle," Couser v. Comenity Bank, 125 F. Supp. 3d 1034, 1048 (S.D. Cal. 2015), since counsel experienced with TCPA litigation "know how to pick a winner"—that is, cases with any real merit typically will resolve before summary judgment or class certification takes place.  Rose, 2014 WL 4273358, at *12; see also In re Capital One Telephone Consumer Protection Act Litigation, 80 F. Supp. 3d 781, 805 (N.D. Ill. 2015) (because statutory damages are high for each TCPA violation, defendants often face "bankruptcy-level exposure" that is "sufficient to compel an in terrorem settlement before a liability determination is made").

[58]   137 Cong. Rec. 30821-30822 (1991).

Suppl. App. Vol. 1, p. 29 of 37

rulings of the Second, Third, Fourth, Fifth, Ninth, and Eleventh Circuits. The Court concluded that even the statements of a sponsor did not trump the federal jurisdiction statute, and in any event, Senator Hollings never addressed the question of federal jurisdiction.[59] But certainly, Senator Hollings' statements are inconsistent with the assertion that a $500 minimum statutory recovery was not sufficient to provide incentives to bring individual claims. Today TCPA attorney fee recoveries ae typically based on a percentage of settlement that provide huge fed awards in cases where the primary risk for plaintiff's counsel is the defendant's ability to pay huge judgments.[60]

It is telling that the legislative history in 1991 and the 2005 amendments apparently did not discuss class actions at all. This is understandable since the *Zahn v. International Paper Company,* 945 S. Ct. 303 (1973) decision precluded aggregation of class damages to reach the $75,000 jurisdictional amount and, prior to the *Mims v. Arrow Financial Services, LLC,* 565 U.S. 318 (2012) opinion, most appellate courts held that the statute did not authorize federal jurisdiction under the TCPA. If Congress believed that class actions were a necessary enforcement, there is nothing in the legislative history or the text of the statute that supports such a speculative conclusion.

In fact, State Attorneys General were authorized to seek minimum statutory damages under 47 U.S.C.A. §227(f) to recover "actual monetary loss, or receive $500 in damages for each violation, or both." Additionally, the Attorneys General are authorized to seek in the court's discretion to "increase the amount of an award to not more than three times the

---

[59]     565 U.S. at 384-385.

[60]     *See fn. 57 supra.*

4814-3580-1163v.7

amount available under the preceding sentence," if there is a willful or knowing violation of such regulation.

The State Attorneys General can only seek such relief in federal court and the Attorney General "has reason to believe that any person engaged, or is engaging in a pattern or practice of telephone calls or other transmissions to residents of the state in violation of this section, or the regulation proscribed under that section."[61]   It seems odd that the Congress would depend on class actions to enforce the Act when there was no basis for federal jurisdiction and even State Attorneys General who were empowered to seek statutory damages for its states' citizens could do so *only* on a showing of a pattern or practice of violations.

Moreover, the petition would not alter the incentive of fax senders to ensure that they have consent before sending facsimile advertisements to targeted recipients.  Because of the individual's private right of action, fax senders would still have incentive to get consent from fax recipients and otherwise comport with the TCPA and the FCC's implementing rules.  The fax sender typically cannot tell at the time of transmission whether the recipient will receive the transmission on a computer via e-mail or on a telephone facsimile machine.[62]   As a result, the fax sender would do its best to ensure that consent is received (or the transmission is otherwise

---

[61]   47 U.S.C. § 227(g)(1).

[62]   For example, fax broadcaster RingCentral explained in its pending petition for declaratory ruling that when sending faxes on behalf of customers who subscribe to RingCentral's Internet-based fax services, "RingCentral routes the fax for the customer to the recipient's telephone number or other address for delivery." *See RingCentral Petition* at 3.  Thus, in many instances, the fax transmission is received on a device other than a telephone facsimile machine, which would automatically print the transmission.

4814-3580-1163v.7

26

permissible), regardless of the equipment the recipient is using to receive the facsimile transmission.

The principal difference resulting from a grant of this petition would be to rein in the possibility of excessive class action awards to frequent TCPA plaintiffs (and their law firms). As the D.C. Circuit noted in the recent *Anda* decision, potential class action liability can far exceed any reasonable view of proportionality.[63]  Were the Commission to confirm that the statute requires an individualized determination as to how recipients actually received unsolicited fax advertisements, recipients of such transmissions on a telephone facsimile machine would still be able to pursue their individual remedy, but they would not be able to extract excessive penalties for other transmissions that did not harm the individual plaintiffs.  In other words, private rights of action on an individual basis would continue, but massive class action damages would not be likely.  Even if a class of individuals with traditional fax machines were ascertainable, the scope of damages would not be inflated by recipients not covered by the statute and not suffering any harm.

The TCPA does not expressly contemplate class action litigation as a remedy for apparent violations of the statute.  Thus, the exponential increase in class action litigation pursuant to the TCPA in recent years suggests that the private remedy for alleged violations is being exploited by an aggressive plaintiffs' bar in order to target legitimate businesses in the

---

[63]  *See Bais Yaakov of Spring Valley v. FCC,* No. 14-1234 (D.C. Cir. 2017) ("Let that soak in for a minute.  Anda was potentially on the hook for $150 million for failing to include opt-out notices on faxes that the recipients had given Anda permission to send.").

4814-3580-1163v.7

27

hopes of a quick "pay day."[64]  As Chairman Pai acknowledged in 2015, "the TCPA has become

the poster child for lawsuit abuse, with the number of TCPA cases filed each year skyrocketing

from 14 in 2008 to 1,908 in the first nine months of 2014."[65]  The narrow relief sought in this

petition would serve as a valuable first step towards curbing these abusive litigation practices by

making clear that the TCPA's statutory remedy is only available to those who are actually

harmed by a fax advertisement by virtue of receiving a transmission that does not comply with

the TCPA requirements on a telephone facsimile machine.[66]

---

[64]  *See RingCentral Petition* at 8 ("[c]laims filed under [the TCPA] have skyrocketed 940% between 2010 and 2015").

[65]  *Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991 et al.*, CG Docket No. 02-278 et al., Declaratory Ruling and Order, FCC 15-72, Dissenting Statement of Commissioner Ajit Pai (rel. July 10, 2015).  Congress seemingly is aware of the issue as well, and just last month convened a hearing before the House Subcommittee on the Constitution and Civil Justice where it heard testimony regarding the abuse of the TCPA's remedy provisions in recent years. *See Lawsuit Abuse and the Telephone Consumer Protection Act: Hearing Before the Subcomm. On the Constitution and Civil Justice of the H. Comm. On the Judiciary*, 115th Cong. (2017) (statement of Becca Wahlquist, Partner, Snell & Wilmer, L.L.P., on behalf of the U.S. Chamber Institute for Legal Reform) (this "litigation … is less about protecting consumers and more about driving a multi-million dollar commercial enterprise of TCPA lawsuits."); *id.* (statement of Adonis E. Hoffman, Esq.) ("the average recovery for a consumer in a TCPA class action settlement was $4.12 (4 dollars). Their lawyers, by contrast, received an average of $2.4 million. Something is wrong with this picture.").  Indeed, the current pending litigation against Amerifactors serves as a prime example of such abuse, as it appears that the plaintiff and plaintiff's counsel in the matter have initiated multiple putative TCPA class actions.

[66]  *See Spokeo, Inc. v. Robins*, -- U.S. --, 136 S.Ct. 1540, 1547-48 (2016) (For a plaintiff to have standing, he or she must allege a concrete injury in fact.  Merely alleging the violation of a statute providing for minimum statutory damages is insufficient to establish standing and "Congress cannot erase Article III's standing requirements by statutorily granting the right to sue to a plaintiff who would not otherwise have standing.").

4814-3580-1163v.7

## VII.    APPLYING THE TCPA TO ONLINE FAX SERVICES WOULD VIOLATE THE FIRST AMENDMENT

The FCC has long recognized that its TCPA rules are subject to the constitutional standards applicable to government restrictions on commercial speech.[67] Numerous courts have been tasked with assessing whether the provisions of the TCPA, including the restrictions on fax advertising, amount to an unconstitutional restriction on commercial speech in violation of the First Amendment. Historically, courts have found that, pursuant to the *Central Hudson* standard, the TCPA is permitted when the government has a "substantial" interest in regulating the speech, that the regulation directly advances the governmental interest asserted, and that the regulation is narrowly tailored to address the governmental interest asserted.[68]

The *Central Hudson* standard cannot be met with respect to online fax services. The great weight of authority based upon the legislative history and the cases interpreting the TCPA rely upon the asserted injury of the transfer of the costs of advertising to the recipient from the sender. For example, in 1995, the Ninth Circuit considered the constitutionality of the TCPA under the First Amendment, and upheld the TCPA fax restriction based upon the record

---

[67]    *See, e.g., Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, Notice of Proposed Rulemaking and Memorandum Opinion and Order, 17 FCC Rcd 17459, 17468 (¶ 12) (citing *Central Hudson Gas & Elec. Corp. v. Public Service Commission*, 447 U.S. 557 (1980)).

[68]    *See Missouri ex rel Nixon v. American Blast Fax, Inc.*, 323 F.3d 649, 654-55 (8th Cir. 2003) (*citing Central Hudson Gas & Elec. Corp. v. Pub. Svc. Comm'n*, 447 U.S. 557, 566 (1980)). TCPA cases typically are assessed using this intermediate scrutiny standard. However, a few recent cases have applied the stricter scrutiny test to the TCPA based upon the theory that the TCPA regulates content of the commercial speech. *See Brickman v. Facebook*, Case No.: 16-cv-00751-THE, 2017 WL 1508719 (N.D. Cal. Apr. 27, 2017); *Holt v. Facebook, Inc.*, Case No. 16-cv-0226-JST, 2017 WL 1100564 (N.D. Cal. Mar. 9, 2017).

4814-3580-1163v.7

Suppl. App. Vol. 1, p. 34 of 37

evidence of cost shifting of advertising expenses and interference with the recipients' phone and fax messages as a legitimate governmental interest, and the prohibition of unsolicited commercial faxes as a reasonable "fit."[69] Similarly, the predominant interest identified by other courts considering TCPA cases were that the unsolicited facsimiles shifted advertising costs of paper and cartridge ink, and a concern that incoming facsimiles caused "interference with machines that could handle one incoming fax at a time."[70] In *Missouri ex rel Nixon*, the Eighth Circuit found the government had a substantial interest in regulating unsolicited faxes because of the shift in advertising costs to the recipient (more than $100 a year in direct costs), the fact that it took 30 seconds for a one page fax to be received, which could tie up the phone line if the machine can only receive one fax at a time, 80% of faxes were printed on paper, and unsolicited faxes interfered with company switchboard operations and burdens their computer networks.[71]

The Ninth Circuit in *Destination Ventures* in 1995 rejected an advertiser's argument that future improvements in technology would remedy those costs to *de minimis* levels, as well as resolving the issue of tying up phone lines, on the basis that such advances were only theoretical. However, as demonstrated above, the advances in fax technology over the past two decades now have tangible effects on cost shifting and disruption to telephone facsimile machines, such that the governmental interest in regulating fax advertisements does not justify

---

[69] *See Destination Ventures, Ltd, v. FCC*, 46 F.3d 54 (9th Cir. 1995).

[70] *See Missouri ex rel Nixon v. American Blast Fax, Inc.*, 323 F.3d 649, 654-55 (8th Cir. 2003) (noting that unsolicited fax advertising interferes with the company switchboard operations and burdens the computer network of the recipients who route incoming faxes into their electronic email systems).

[71] *See Missouri ex rel Nixon v. American Blast Fax, Inc.*, 323 F.3d 649, 654-55 (8th Cir. 2003).

4814-3580-1163v.7

30

restrictions on the receipt of faxes via online fax services. *Nixon*, too, was decided before technological advances that minimize the damages and injury, particularly with respect to online fax services. As a result, even if a fax received via an online fax service could be construed as subject to an ambiguous TCPA provision, the government interest in addressing such services would not be "substantial." Indeed, "if the harm to the public is very small quantity, preventing that harm cannot be a substantial governmental interest."[72]

As explained above, faxes received via online fax services result in little to no cost to the recipient, and do not occupy the recipient's machine so that it is unavailable for other messages. As such, the government interest is not substantial, and the resulting restriction on speech would violate the Constitution.

---

[72]    *See Centerline Equipment Corp. v. Banner Personnel Service, Inc.*, 545 F. Supp. 2d 768, 773 (N.D. Ill. 2008).

4814-3580-1163v.7

31

## VIII.  CONCLUSION

For the reasons set forth in this Petition, Amerifactors requests that the Commission expeditiously issue a declaratory ruling that the TCPA does not apply to fax advertisements that the recipient receives through online fax services or on a device other than a telephone facsimile machine.

Respectfully submitted,

By: _____
       Steven A. Augustino
       Jennifer R. Wainwright
       KELLEY DRYE & WARREN LLP
       3050 K Street NW
       Suite 400
       Washington, D.C.  20007
       (202) 342-8400 (Voice)
       (202) 342-8451 (Facsimile)
       saugustino@kelleydrye.com

       Douglas B. Brown
       RUMBERGER KIRK & CALDWELL
       300 South Orange Avenue
       Suite 1400
       Orlando, FL  32801
       (407) 839-2150
       dbrown@rumberger.com

       *Counsel* for *Amerifactors Financial
        Group, LLC*

July 13, 2017

4814-3580-1163v.7

32